Filed 6/26/26  Elizabeth v. Palumbo CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| CAMRON ELIZABETH, | D086913 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CVPS2106116) |
| MARK PALUMBO et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Riverside County, Manuel Bustamante, Jr., Judge.  Affirmed.

The Law Offices of Stephen B. Morris and Stephen B. Morris for Defendants and Appellants.

Brock & Gonzales, D. Aaron Brock, Cory H. Hurwitz; Pletcher Law, Andrew S. Pletcher; Spencer & Mulally and Thomas Mulally for Plaintiff and Respondent.

Mark Palumbo, XCEPTOR LLC, and Electronic Servitor Publication Network, Inc. (Electronic Servitor)[1] (sometimes collectively Defendants) appeal from the judgment for plaintiff Camron Elizabeth following a bench trial. As relevant to this appeal, the court awarded Elizabeth (1) $150,000 in past and future damages on her claim for hostile work environment (sexual harassment) against the Defendants and (2) $50,000 against XCEPTOR LLC and Electronic Servitor (sometimes collectively Corporate Defendants) for past damages for their failure to prevent harassment. Both claims were based on the Fair Employment and Housing Act (FEHA) (Gov. Code,[2] § 12900 et seq.).

As a threshold issue, Elizabeth contends we lack jurisdiction to consider the Defendants' appeal because their notice of appeal was untimely. She contends that, because they allegedly filed an invalid new trial motion, they were not entitled to the 30-day extension to appeal, commencing from

[1]    Electronic Servitor legally changed its name in September 2021. The trial court found Electronic Servitor was the "same company" as its predecessor, CannAssist International Corp. (CannAssist), and therefore included both Electronic Servitor and CannAssist in the judgment. The Defendants have not challenged this finding on appeal. For convenience, we will refer to both companies as CannAssist, unless otherwise indicated.

[2]    All undesignated statutory references are to the Government Code.

the date of service of the denial of the motion. (See Cal. Rules of Court,[3] rule 8.108(b)(1)(A).) We disagree, as we explain later in this opinion.[4]

Reaching the merits, the Defendants contend the judgment should be reversed because there is no substantial evidence (1) Elizabeth was subject to a hostile work environment because Palumbo's conduct toward her was "occasional, isolated, sporadic and trivial"; and (2) the Corporate Defendants qualified as Elizabeth's "employer" under the FEHA.

Regarding the Defendants' first claim, the record contains ample evidence to support the trial court's finding that the Defendants subjected Elizabeth to a hostile work environment due to Palumbo's sexual harassment. As to their second claim, we conclude the Corporate Defendants have forfeited this issue on appeal by failing to timely raise it in the trial court. We thus affirm the judgment.

---

[3]     All further "rule" references are to the California Rules of Court.

[4]     Elizabeth also argues we should dismiss the appeal because the Defendants failed to provide an adequate record, omitting various trial exhibits and other documents she claims were necessary for the proper consideration of the issues. We note Elizabeth made the same request in a motion to dismiss, which Division Two of our court denied. In so doing, our court encouraged Elizabeth as a matter of "judicial economy" to include in a respondent's appendix "any documents [she] believes should have been included in the appellants' appendix." We thus deny her renewed request to dismiss the appeal based on the alleged inadequacy of the Defendants' appendix.

3

FACUTAL AND PROCEDURAL BACKGROUND[5]

A. *Overview*

Palumbo hired Elizabeth in November 2020 to work as the Director of Sales and Marketing for his businesses. They met during a business call that also included Elizabeth's then employer, Susan Anderson, who would later appear as a witness in this case. Shortly thereafter, Anderson scaled back her business and recommended that Palumbo hire Elizabeth.

Under a consulting agreement with CannAssist, Elizabeth received a monthly salary of $7,500 and stock options that vested over time. The agreement also provided she was an independent contractor and not an employee of CannAssist. Elizabeth believed she would be selling consumer products such as "creams, capsules and pet drops" for a company she thought was "financially stable." She mostly worked remotely from her home in Palm Desert.

Not long after beginning work, Elizabeth came to the realization that Palumbo had hired her to be his "assistant" and treated her like his "companion"; and that CannAssist was "not really a business that sold anything," as it had no money to spend on marketing and sales promotion. Elizabeth had no decision-making authority in the business and was not involved in the company's day-to-day operations. Instead, her typical

---

[5] In reviewing a judgment based upon a statement of decision following a bench trial, we "apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).)

workday consisted of Palumbo assigning her various tasks she described as "busywork" and "playing business."

Elizabeth occasionally went on work trips, including two with Palumbo. She also worked with him at his Fallbrook home one or two days each month, "filling jars" in a "rudimentary lab" inside his garage. While working in Fallbrook, Elizabeth would stay at Palumbo's home, which he shared with his wife Marla Palumbo. Elizabeth did not feel the work trips to Fallbrook were productive.

Palumbo referred to Elizabeth as " 'my girl' " and " 'my wife.' " She believed his level of "inappropriate behavior grew over time." Sometimes he would try and kiss her on the lips when he greeted her, and hug her "tightly" and hold her "far longer than appropriate." He also would comment on her attractiveness and inquire whether she had "breast implants"; and ask about her "sex life," including whether she still enjoyed sex.

Palumbo also shared intimate details about himself, including about his "sexual prowess" and having an "affair"; and often commented about leaving Marla Palumbo and " 'riding off into the sunset' " with Elizabeth, as he felt she understood him better than his wife. Palumbo admitted he complimented Elizabeth on her looks and told her she was attractive; and that his custom was to "lean in" when he hugged and kissed people "regardless of [their] gender." He, however, denied having any romantic feelings for Elizabeth and believed if anyone had been inappropriate it was Elizabeth, "for her overly flirtatious behavior and choice of dress for work."

The trial court highlighted an incident that occurred on May 5, 2021, when Palumbo visited Elizabeth's home in Palm Desert. She invited Palumbo to join her and her boyfriend for dinner. Palumbo declined. The next day, he expressed his "frustration" that Elizabeth was "flirting with

5

him" but "rejecting him." Elizabeth corrected Palumbo, telling him their relationship was strictly professional, as he was her "boss and a married man." Palumbo replied he felt "like a school boy after the pretty girl [had] rejected him."

In mid-August 2021, Palumbo accidentally called Elizabeth while having a conversation with his father. During the call, Elizabeth overheard Palumbo say that Elizabeth "threw herself" at him and "wanted to flirt herself into a relationship with him"; and that she was " 'oversexualized' and acted as if she 'was banging everything out there that walks.' " Elizabeth was "disgusted, offended, and hurt" by his comments.

Also in mid-August 2021, Palumbo sent Elizabeth a lengthy e-mail describing a "less than flattering" presentation she had given to a potential business client. In that e-mail, Palumbo referenced the conversation between him and his father that Elizabeth had overheard, noting he previously had expressed these same "concerns" to her but that she either did not understand them or did not care. Palumbo also claimed Elizabeth was "trying to keep [him] away," questioned whether she really "trust[ed]" him, and stated he was a "safe space" for her and together they could " 'work through anything.' " Two weeks later, Palumbo terminated her. She responded by calling him a " 'sexual predator.' "

B. *Lawsuit and Trial*

Elizabeth commenced this action in November 2021, alleging 13 causes of action in her operative first amended complaint (FAC). As relevant to this appeal, she asserted claims under the FEHA for (1) hostile work environment (sexual harassment) against the Defendants; and (2) failure to prevent harassment against the Corporate Defendants.

6

A multiday bench trial was held in March 2024 that included the testimony of 12 witnesses. On April 30, 2024, the trial court issued its final statement of decision (SOD). On her hostile work environment claim, the court awarded Elizabeth $125,000 against Defendants for past general damages and $25,000 for future general damages. On her failure to prevent harassment, the court awarded her $50,000 against the Corporate Defendants for past general damages. On October 15, 2024, the court entered an amended judgment for Elizabeth that included attorney fees of $257,161.80 and costs of $20,439.92.

DISCUSSION

I.

Timeliness of the Defendants' Appeal

Elizabeth contends we lack jurisdiction to resolve this case because the Defendants did not file "a valid notice of *intention* to move for a new trial." (Rule 8.108(b), italics added.) She thus claims that the Defendants were not entitled to the 30-day extension under rule 8.108(b) to appeal the judgment, rendering it untimely. We are not persuaded.

A. *Additional Background*

On May 13, 2024, the trial court entered judgment for Elizabeth. A week later, the Defendants filed their motion for new trial and/or clarification on statement of decision and amendment of judgment. As relevant here, the Defendants alleged the damage awards were "[e]xcessive" (Code Civ. Proc., § 657, subd. (5)) and unsupported by the evidence and against the law (*id.*, subd. (6)). Elizabeth filed and served her notice of entry of judgment along with a copy of the judgment on May 24, 2024.

On July 24, 2024, the trial court denied the Defendants' new trial motion as a result of their failure to include the "minutes of the court." (Code

7

Civ. Proc, § 658.)[6]  Also on July 24, Elizabeth served the Defendants with a notice of ruling denying their new trial motion.[7]  The Defendants filed their Notice of Appeal on August 9, 2024.[8]

B.  *Guiding Principles and Analysis*

A party must file a notice of appeal no later than 60 days from the date the party is served with a notice of entry of judgment.  (Rule 8.104(a).)  As relevant here, however, the time to appeal can be extended by 30 days after the court clerk or party serves the order denying a new trial motion if the "party serves and files a valid notice of intention to move for a new trial." (Rule 8.108(b)(1)(A); see Code Civ. Proc., § 659, subd. (a) [a party moving for new trial shall timely file with the clerk and serve upon the adverse parties "a notice of their intention to move for a new trial, designating the grounds

---

[6]  Code of Civil Procedure section 658 provides:  "When the application [for a new trial] is made for a cause mentioned in the first, second, third and fourth subdivisions of Section 657 [of the Code of Civil Procedure], it must be made upon affidavits; otherwise it must be made on the minutes of the court."

[7]  The Defendants have not challenged the trial court's ruling denying their new trial motion.

[8]  On October 3, 2024, the trial court issued its minute order awarding Elizabeth attorney fees and costs against the Defendants.  They responded by filing an "Amended Notice of Appeal" on October 8, 2024, ostensibly to the October 3 minute order, inasmuch as the court did not enter the amended judgment until October 15, 2024.  (See Rule 8.104(d)(1) ["A notice of appeal filed after judgment is rendered but before it is entered is valid and treated as filed immediately after entry of judgment."].)

8

upon which the motion will be made and whether the same will be made upon affidavits or the minutes of the court, or both"].)

We conclude the Defendants' new trial motion satisfied section 659 of the Code of Civil Procedure; and therefore, that they were entitled to a 30-day extension—from the date of service of the order denying the motion—to file their appeal. (See Rule 8.108(b)(1)(A).) There is no dispute that the Defendants timely filed their new trial motion on May 20, 2024, four days before Elizabeth served her notice of entry of judgment. (See Code Civ. Proc., § 659, subd. (a) [providing in part that the party moving for new trial shall file and serve their moving papers "(1) [a]fter the decision is rendered and before the entry of judgment"].)

In addition, the Defendants' new trial motion set forth the grounds for the motion under Code of Civil Procedure 657: "5. Excessive or inadequate damages"; and "6. Insufficiency of the evidence to justify the verdict . . . , or the verdict . . . is against law"; and included a lengthy memorandum of points and authorities, as we have noted.

That the Defendants did not file a notice of *intention* to move for a new trial does not render their motion invalid. "[A] notice of intention to move for a new trial shall be deemed to be a *motion for a new trial* on all grounds stated in the notice." (Code Civ. Proc., § 659, subd. (b), italics added.) The notice requirement enables the court clerk to set the date and time for the hearing. (Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2025) ¶ 18:237, p. 70 [the date and time "are calendared and scheduled by the court and the parties are advised by the court clerk"].) In the instant case, the Defendants' motion included the date and time of the hearing. Elizabeth's argument that the Defendants' motion itself was invalid, when by statute it is the legal equivalent of a notice of intention to

9

move for a new trial (Code Civ. Proc., § 659, subd. (b)), would require us to promote form over substance, which we decline to do. (See Civ. Code, § 3528 ["The law respects form less than substance."].)

Elizabeth also contends the Defendants' new trial motion was invalid under rule 8.108(b)(1)(A) because it failed to include "the minutes of the court." (See Code Civ. Proc., §§ 658 & 659, subd. (a).) Despite the language of these statutes requiring either an affidavit or the minutes of the court to accompany a new trial motion, our Supreme Court has rejected the argument that "the court is without jurisdiction" to decide "a motion for new trial when the notice of intention to make such a motion does not state that it will be made on the minutes of the court." (See *Nichols v. Hast* (1965) 62 Cal.2d 598, 600 (*Nichols*).)

In reaching its decision, the *Nichols* court noted that the trial court "may consider its own minutes when ruling on a motion for new trial [citation], since it may take judicial notice of such records" (*Nichols, supra*, 62 Cal.2d at p 600); that the purpose of Code of Civil Procedure section 659 "is to give the adverse party a reasonable opportunity to oppose a motion for a new trial on the merits" (*Nichols*, at p. 600); that the "defendant had such opportunity, for plaintiffs' notice clearly stated that the motion would be made on the ground that the evidence was insufficient to justify the verdicts" (*ibid.*); and that, "[u]nlike a notice that a motion for a new trial will be made on grounds specified therein [citation], further notice that it will be made on affidavits or the minutes of the court is *not jurisdictional*" (*ibid.*, italics added). The *Nichols* court concluded: " 'when the adverse party has been given due notice that . . . a motion [for a new trial] will be made and is fully apprised of the grounds to be urged the jurisdiction of the court is complete.' " (*Ibid.*)

10

In light of *Nichols*, we conclude the Defendants' new trial motion was a "valid" motion within the meaning of rule 8.108(b)(1)(A), as it complied with the procedural requirements to confer jurisdiction on the trial court. (See Code Civ. Proc., §§ 657 & 659, subd. (a); *Nichols, supra*, 62 Cal.2d at p. 600.) We therefore conclude their notice of appeal from the judgment was timely, as they filed it within 30 days after Elizabeth served them with the notice of ruling denying their new trial motion.

In resolving this issue, we conclude our case is distinguishable from *Branner v. Regents of University of California* (2009) 175 Cal.App.4th 1043, on which Elizabeth relies. In *Branner*, the Court of Appeal concluded the plaintiff did not meet the procedural requirements of Code of Civil Procedure section 1008 when he filed his motion to reconsider without a supporting affidavit. (*Branner,* at p. 1048.) Under this statute, a moving party must submit an affidavit stating "what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown." (Code Civ. Proc., § 1008, subd. (a).) Because of this missing information, the *Branner* court concluded the plaintiff was not entitled to the 30-day extension under rule 8.108(e); and therefore his appeal was untimely. (*Branner,* at pp. 1049–1050.)

Here, unlike the plaintiff in *Branner*, the Defendants met the minimum procedural requirements for their motion (see Code Civ. Proc., §§ 657–659), and thus were entitled to the 30-day extension to file their notice of appeal from the judgment (see rule 8.108(b)(1)(A)).

11

## II.

### Hostile Work Environment (Sexual Harassment)

The Defendants contend that no substantial evidence supports the trial court's finding that Palumbo, as Elizabeth's "direct supervisor," engaged in conduct toward her that amounted to pervasive sexual harassment in the workplace. We disagree.

### A. *Standard of Review*

We apply a substantial evidence standard of review to the trial court's findings in reviewing a judgment based upon a statement of decision. (*Thompson, supra*, 6 Cal.App.5th at p. 981.) "Our review '*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' " (*Caldera v. Department of Corrections and Rehabilitation* (2018) 25 Cal.App.5th 31, 37 (*Caldera*).) "[A]ll factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment [citation]. All issues of credibility are likewise within the province of the trier of fact." (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925.)

" ' " 'When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' " ' " (*Washington v. Farlice* (1991) 1 Cal.App.4th 766, 772.) " 'Reversal for insufficient evidence is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury verdict.' " (*Casey N. v. County of Orange* (2022) 86 Cal.App.5th 1158, 1170–1171.)

### B. *Guiding Principles*

The FEHA makes it an unlawful for an employer to harass an employee based on membership in a protected class, including an employee's "sex."

12

(§ 12940, subd. (j)(1)–(4)(C).) " '[T]he prohibition against sexual harassment includes protection from a broad range of conduct, [including] the creation of a work environment that is hostile or abusive on the basis of sex.' " (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277 (*Lyle*).)

A hostile work environment claim requires a showing the plaintiff "was subject to harassing conduct that was (1) unwelcome, (2) because of sex or gender, and (3) sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment."[9] (*Kruitbosch v. Bakersfield Recovery Services, Inc.* (2025) 114 Cal.App.5th 200, 213.)

California has adopted the federal standard prohibiting sexual harassment. (*Lyle, supra*, 38 Cal.4th at p. 278, citing title VII of the federal Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e et seq.).) "[W]hile the wording of Title VII and the FEHA differs in some particulars, both statutory schemes regard the prohibition against sexual harassment as part and parcel of the proscription against sexual discrimination, and 'the antidiscriminatory objectives and overriding public policy purposes of the two acts are identical.' " (*Lyle,* at p. 278; accord, *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 463 ["Although the FEHA explicitly prohibits sexual harassment of employees, while Title VII does not, the two enactments share the common goal of preventing discrimination in the workplace."].)

"Whether a work environment is reasonably perceived as hostile or abusive 'is not, and by its nature cannot be, a mathematically precise test.' [Citation.] 'The working environment must be evaluated in light of the totality of the circumstances.' [Citations.] ' "These may include the

---

9     At trial, Elizabeth conceded the harassing conduct was not "severe" but only "pervasive."

13

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' [Citations.] ' "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." ' " (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 628 (*Bailey*)); accord, *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706 ["harassment focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee"].) For a claim based on a hostile or abuse work environment, the plaintiff "need not show evidence of unwanted sexual advances." (*Lyle, supra*, 38 Cal.4th at pp. 277–278.)

"The standard for workplace harassment claims strikes a 'middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.' " (*Bailey, supra*, 16 Cal.5th at p. 628.) " 'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond [FEHA's] purview.' " (*Ibid.*) " 'But [FEHA] comes into play before the harassing conduct leads to a nervous breakdown' " and forbids discriminatory conduct that " 'detract[s] from employees' job performance' " or " 'keep[s] them from advancing in their careers.' " (*Ibid.*)

" 'When the harasser is a supervisor, the employer is strictly liable for the supervisor's actions.' " (*Bailey, supra*, 16 Cal.5th at p. 635.)

C. *Analysis*

The evidence shows Elizabeth worked directly with Palumbo and that his communication with her was "constant." When initially hired, Palumbo led Elizabeth to believe she would be working in a "professional setting" with a "thriving company." Although Palumbo communicated with her on a "friendly basis," she held on to the belief that their relationship would remain "professional." But she "quickly learned [that] this was not a professional relationship because there was not a profession"; that CannAssist was not a business that "sold anything" and had no money to spend on marketing and sales promotion; and that she was hired to be Palumbo's "assistant" and "play[] business."

Elizabeth described how Palumbo would touch her inappropriately. From the beginning, she felt his "hugs were too intimate" and unprofessional, more like an "embrace" that "lingered" "most frequently out of the view of anybody else," including his wife. Palumbo "on a number of occasions" also tried to kiss Elizabeth on the lips, which she found "disturbing." Elizabeth also became "angry" and felt "shame," as she already had told him that conduct needed to stop. At the same time, she was "fearful" of losing her job.

Palumbo also made comments on a number of occasions that Elizabeth found offensive and inappropriate. Early on during her employment, Palumbo interviewed a woman candidate for a sale's position for his business. After the interview, he told Elizabeth the candidate would not work out because she "look[ed] like a floozy" and her "boobs were out all over the place." Elizabeth told Palumbo he should not be speaking "to women about women like that" and that his comments were "derogatory." She also found inappropriate his use of "endearing names" for her, as he referred to her as "my girl," "his wife," and his "better half."

15

Palumbo spoke to Elizabeth on a "daily basis" about the stock price of CannAssist. Once the stock reached a certain price, Palumbo said he would sell the company and he and his wife would go their "separate ways"; and that he and Elizabeth could then be together "on a beach drinking cocktails" and "ride off into the sunset together." Elizabeth, however, never accepted Palumbo's invitation or "implied that, Yes, that sounds like a great idea."

Palumbo also asked Elizabeth about her boyfriend, including inquiring about the size of his penis, and about her sex life in general, as the trial court noted. He also confided in Elizabeth about his "sexual proclivities," including his sexual relationship with his wife and infidelity. Elizabeth interpreted these conversations as Palumbo's attempt to "open[] [the] door"—"an invitation"—to having a relationship with her.

Palumbo also made comments to Elizabeth about her physical appearance. He asked whether her "boobs were fake"; and told her she was a "knockout," had a "rocking body," was "beautiful," and could get "anybody" she wanted. He also bragged to his friends about her looks, which made her "really, really uncomfortable" and feel like "a hood ornament versus a valued person or employee."

As time went on, Palumbo's conduct toward Elizabeth became more "pervasive and invasive," and when she told him he was being inappropriate, he "would just laugh" and say, "Oh, that's just me, I don't have a filter." Elizabeth felt like she was being "groom[ed]" by Palumbo, as she unsuccessfully attempted to draw a "line in the sand" with him.

As a result of Palumbo's conduct, Elizabeth experienced increased anxiety at work. She looked for ways to decrease her communication and interaction with him, including working remotely in another state "so that [they] wouldn't have these frequent unproductive work meetings in a

16

condominium or anywhere else that wasn't a professional setting." She also experienced physical symptoms including headaches, stomachaches, and severe insomnia due to Palumbo's conduct.

Elizabeth described the romantic overture Palumbo made on May 5, 2021, when he came to Palm Desert for their in-person meeting. Palumbo typically assumed they would have dinner together during such meetings. On this occasion, however, Elizabeth had plans with her boyfriend, and instead asked Palumbo to join them for dinner, hoping he would finally recognize she was not interested in anything other than a professional relationship with him.

When Palumbo arrived at her home, he appeared "withdrawn," told Elizabeth they "need[ed] to talk," and said, "he didn't understand why [she] was flirting with him, and then rejecting him." He claimed she had "crossed" and "uncrossed" her legs in front of him when he visited her home, before he hired her. Elizabeth told Palumbo he was "wrong" and his statements were "inappropriate," as she had not flirted with him and her family had been in the same room when they met that day.

During their conversation, Palumbo also wanted to know why Elizabeth had been so "secret[ive]" about her boyfriend. Elizabeth told Palumbo it was none of his business and that she saw him only as her boss. Palumbo then responded, "You make me feel like the sixth grade boy on the playground being rebuked by the pretty girl."

Elizabeth felt "punished" by Palumbo as a result of rejecting his sexual advances and "powerless" to stop his inappropriate behavior, making her feel "helpless and hopeless." Unlike before when he engaged her "on a continuous basis throughout the day," after May 5th Palumbo retreated, making work even more difficult for her.

In late June 2021, Palumbo sent Elizabeth a photograph of himself in a somewhat suggestive position. The photograph included a caption that read, "Tell me how sexy I am!" and "I'm telling you! The mice can't stay away." Elizabeth was "greatly offended" by the photograph because she had already told Palumbo to "stop it," that she only wanted a professional relationship with him, and because he was not communicating with her on work-related matters but had the temerity to send the photograph in the "middle of the work day."

In mid-August 2021, Palumbo accidently called Elizabeth (i.e., a "butt dial" call). Elizabeth heard him making "very derogatory comments about a woman," then realized he was talking about her. During the call, Palumbo called her "oversexualized" and claimed she wanted a relationship with him because he was "a successful businessman." He also talked about her mental health struggles, including how she had experienced a sexual assault when she was younger. After about 10 minutes, Palumbo hung up the phone. He later admitted that the conversation she overheard was between him and his father.

In another incident when they were together for business, Palumbo introduced Elizabeth as "his assistant during the day." That night, however, when they were having dinner with clients, he put his arm around her, pulled her close and told the waitress, "My wife can order for me. She knows what I like." Elizabeth "forcefully removed his hand" and after dinner, Palumbo apologized. The following day, Elizabeth "lost it" and "emphatically" told him to stop presenting her as his "wife or girlfriend" and touching her. Palumbo again apologized. But according to Elizabeth, his "style" was to "apologize" then "[m]isbehave," while constantly telling her they were "going to get so rich."

Based on the totality of the circumstances, we conclude there is ample evidence to support the trial court's finding that Palumbo's conduct created a hostile and abusive working environment for Elizabeth. That is, over the course of her employment, Palumbo's behavior sufficiently offended, humiliated and distressed Elizabeth, altering the conditions of her employment with the Defendants. (See *Lyle, supra*, 38 Cal.4th at p. 279; accord, *Wawrzenski v. United Airlines, Inc.* (2024) 106 Cal.App.5th 663, 692–693.)

We further conclude that Palumbo's conduct was sufficiently pervasive "to create an objectively hostile and abusive work environment." (See *Bailey, supra*, 16 Cal.5th at p. 628; § 12923, subd. (a).)[10] The trial court heard the testimony of Elizabeth's former employer, Susan Anderson, finding her to be "one of the more compelling and credible witnesses at trial."

Anderson testified she met Palumbo in about 2018 through a business referral. She recommended Elizabeth to Palumbo, as she and Elizabeth had worked together "on and off" and she greatly admired Elizabeth's work-ethic and intelligence. After Palumbo hired Elizabeth, Anderson "sense[d]" there was "some difficulty," as Elizabeth had confided that Palumbo "was crossing the line" and making her "very, very uncomfortable," including telling Elizabeth he thought "about her when he was taking a shower in the

---

[10] Section 12923, subdivision (a) provides in part: "[I]n a workplace harassment suit 'the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. It suffices to prove that a *reasonable person* subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to make it more difficult to do the job." (Italics added.)

19

morning." Elizabeth also said Palumbo was coming "too close" and "invad[ing]" her "space," and touching her inappropriately.

Anderson also *witnessed* Palumbo interact with Elizabeth. Anderson could tell he was "enamored" by Elizabeth and had a "boy crush" on her. Anderson opined that as her employer, Palumbo was "far too comfortable" around Elizabeth, testifying he would "position himself right next to [Elizabeth]" and "put his arm around her" when outside his wife's presence.

At some point, Anderson learned that Palumbo had terminated Elizabeth's employment. Anderson rehired Elizabeth and observed she was "very upset" and "very sad"; that she appeared to have lost her "confidence" and "strength"; and that being employed and terminated by the Defendants had taken "a huge toll" on her.

We conclude Anderson's testimony, when viewed under the " 'totality of the circumstances' " (see *Bailey, supra*, 16 Cal.5th at p. 628), supports the finding that Palumbo's conduct toward Elizabeth created an objectively hostile and abusive work environment (see *ibid.*). The trial court found Anderson's testimony "independent[ly]" corroborated its finding that Palumbo, "as Plaintiff's direct supervisor, engaged in a pattern of unwelcome sexual harassment" that "alter[ed] the conditions of [Elizabeth's] employment."

The Defendants nonetheless raise a series of arguments that Palumbo's conduct was not sufficiently pervasive to support an environmental workplace claim, including that: (1) Elizabeth worked remotely for most of her employment and had limited "physical contact" with Palumbo; (2) he "operated a small start-up business out of [his] garage" and his interactions with her "were naturally informal"; (3) she felt comfortable enough at the Palumbos' home to "socialize" with them and repeatedly stay

20

the night; (4) he hugged "both men and women when meeting them or saying goodbye," and likewise would also "kiss both men and women on the cheek," as was "his custom"; (5) they texted each other and "joked" about "cocktails, mixes, and favorite drink recipes"; and (6) his "boy crush" on her, even if true, did not "translate[] in any way to sexual harassment, especially given [Elizabeth's] penchant for leading him on," and given that his "crush" (allegedly) was nothing more than " 'puppy love' " involving "immature, innocent and harmless array of feelings which can attach to a person by way of unfulfilled fantasy."

The Defendants' arguments boil down to a request that we reweigh the evidence and the credibility of the witnesses and make new findings favorable to them. This we cannot do when reviewing for sufficiency of the evidence. (See *Thompson, supra*, 6 Cal.App.5th at p. 981; accord, *Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162 [" 'It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility.' "]; *Estate of Young* (2008) 160 Cal.App.4th 62, 76 [we do not "reweigh the evidence and are bound by the trial court's credibility determinations"].)

In addition, the standard for sexual harassment does not depend on the "type of workplace," as the Defendants argue. (See § 12923, subd. (d)[11]; see also *Okonowsky v. Garland* (9th Cir. 2024) 109 F.4th 1166, 1180 [the

---

11 Section 12923, subdivision (d) provides in part: "The legal standard for sexual harassment should not vary by type of workplace. It is irrelevant that a particular occupation may have been characterized by a greater frequency of sexually related commentary or conduct in the past. In determining whether or not a hostile environment existed, courts should only consider the nature of the workplace when engaging in or witnessing prurient conduct and commentary is integral to the performance of the job duties."

"non-exhaustive list of the circumstances and characteristics of alleged harassment . . . does not distinguish between conduct occurring on or off the physical or digital worksite"].)  That Palumbo ran his business "out of the garage," or that Elizabeth mostly worked from her home, or that they had limited "physical contact," are not determinative.  Instead, we must look at the totality of the circumstances, which in this case supports the trial court's finding that Palumbo sexually harassed her.  (See *Bailey, supra*, 16 Cal.5th at p. 628.)

The Defendants next ask that we impose a "*new* requirement [under the FEHA] requiring proof of a documented complaint in the context of a pervasive hostile work environment claim."  (Italics added.)  For support, they cite to the SOD, arguing:  " 'It is noteworthy that the court highlighted respondent's lack of complaints and posited that the lack of complaints likely caused Mr. Palumbo to continue to interact as usual with respondent' "; and that Elizabeth " 'did not expressly complain until her termination.' "

The Defendants, however, neglected to cite to that portion of the SOD in which the trial court explained *why* Elizabeth allegedly did not complain about Palumbo's conduct:  "[S]he testified and *understandably* that she had a well paying job and tried to maintain a professional relationship hoping the advances by Defendant Palumbo would stop.  The court does note though that the text message history reflects *numerous* instances of Plaintiff responding to Defendant Palumbo with subtle reminders that he was married and to change the conversation (e.g., 'Hope you two have a great weekend . . . how are you two doing,['] etc.)."  (Italics added.)  The Defendants also ignore the court's finding that Palumbo, as Elizabeth's "direct supervisor," "was responsible for preventing the very harassment he was guilty of perpetrating," and that as a result, he was "free to act without

22

limitations" because the Defendants did not have "any sexual harassment or anti-retaliation policies."

In any event, the Defendants misconstrue our authority as a court: we do not write the law but only interpret it. (See e.g., *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 675 (conc. opn. of Werdegar, J.) ["[A]s this court has often recognized, the judicial role in a democratic society is fundamentally to interpret laws, not to write them."].) We thus refuse their invitation to impose a documentation requirement for a hostile work environment claim, and apply such a rule retroactively to Elizabeth in this case. (See *In re Marriage of Buol* (1985) 39 Cal.3d 751, 754 [retroactive application of a law is unconstitutional if it deprives a person of a vested right without due process of law].)

### III.

### Failure to Prevent Harassment

The Defendants next contend the trial court erred in finding the Corporate Defendants separately liable under section 12940, subdivision (k)[12] for their failure to prevent Palumbo's sexual harassment of Elizabeth. (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 286 [section 12940, subdivision (k) "creates a tort that is made actionable by statute"].) We note they do not challenge the amount of the award or that such a tort exists. Instead, the Defendants contend the award cannot stand because Elizabeth cannot show the Corporate Defendants were

---

[12] Section 12940 provides in part, "[i]t is an unlawful employment practice [¶] . . . [¶] (k) For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

her "employer." We conclude the Defendants have forfeited this issue on appeal.

A. *Guiding Principles*

With certain exceptions not applicable here, an " '[e]mployer' includes any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly, the state or any political or civil subdivision of the state, and cities." (§ 12926, subd. (d).) The Defendants contend it was Elizabeth's burden to show they had five or more employees. (See *ibid.*)

The issue of whether a person is an employee or independent contractor depends on many factors, including "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." (*Tieberg v. Unemployment Ins. Appeals Board* (1970) 2 Cal.3d 943, 946.) "[W]hile the right to control work details 'is the "most important" or "most significant" consideration, the authorities also endorse several "secondary" indicia of the nature of a service relationship.' "[13] (See

---

[13] Secondary factors to evaluate an employment relationship include: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 351 (*Borello*).)

*Arzate v. Bridge Terminal Transport, Inc.* (2011) 192 Cal.App.4th 419, 426 [the " ' "control" test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service agreements' "].)  The determination of whether a person is an employee or independent contractor "is one of fact if dependent upon the resolution of disputed evidence or inferences." (*Borello, supra*, 48 Cal.3d at p. 349.)

B. *Analysis*

In her operative FAC, Elizabeth alleged that the Corporate Defendants were her " 'employers' " as defined by section 12926, subdivision (d), which allegation she incorporated into her fourth cause of action for failure to prevent harassment.  The Defendants subsequently moved for summary adjudication, but only as to Elizabeth's wage and hour causes of action (i.e., sixth, seventh, eighth, tenth, and eleventh causes of action), arguing she was an exempt employee and therefore "not entitled to overtime or meal/rest breaks."[14]

The *first* time the Defendants raised the issue of whether the Corporate Defendants were Elizabeth's "employer" under section 12926, subdivision (d) was in their new trial motion, where they sought "clarification" as to the trial court's $50,000 damage award against the Corporate Defendants.  In their motion, they argued that the "number of employees at CannAssist and XCEPTOR was not at issue in the trial"; that "[e]ach corporation had three employees and an independent contractor, namely Mr. and Mrs. Palumbo, Plaintiff, and Braden Traub"; that "Mr. and Mrs. Palumbo and Braden Traub

---

[14]     The Defendants have not challenged the trial court's ruling on Elizabeth's wage and hour law causes of action.

each testified they were the only additional employees to Plaintiff"; and that at another point "Mr. Traub clarified he was an independent contractor."

On appeal, however, the Defendants in their opening brief claimed that Palumbo and his wife were *not* employees of the Corporate Defendants, contradicting their earlier claim. And at oral argument before this court on June 9, 2026, the Defendants represented that CannAssist had only two employees: Elizabeth *and* Braden Traub, despite their previous representation that Braden Traub was an independent contractor. On further questioning, the Defendants stated they did not know whether Benjamin Perlstein, who was another individual affiliated with the Corporate Defendants, was their employee or independent contractor.

The record thus shows that (1) the Defendants were aware of the "employer issue" at the early stages of the litigation, based on Elizabeth's allegations in her operative FAC; (2) the Defendants could have raised this issue, but chose not to, (i) as an affirmative defense, (ii) in their summary adjudication motion, and/or (iii) at trial; (3) they confusingly have taken inconsistent positions on who was and was not an employee of the Corporate Defendants; and (4) the issue of whether Braden Traub, Benjamin Perlstein, Palumbo, and Marla Palumbo were employees was contested and required a determination by the trier of fact. (See *Borello, supra*, 48 Cal.3d at p. 349.)

"As a general rule, a party is precluded from urging on appeal any point not raised in the trial court. [Citation.] Any other rule would ' " 'permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he [or she] is aware and thereby permitting the proceedings to go to a conclusion which he [or she] may acquiesce in, if favorable, and which he [or she] may avoid, if not.' " ' " (*In re Riva M.* (1991) 235 Cal.App.3d 403, 411–412; accord, *Howitson v.*

26

*Evans Hotels, LLC* (2022) 81 Cal.App.5th 475, 489 ["the failure to raise an issue in the trial court typically forfeits on appeal any claim of error based on that issue"]; *Araiza v. Younkin* (2010) 188 Cal.App.4th 1120, 1127 ["[a] party who fails to alert the trial court to an issue that has been left unresolved forfeits the right to raise that issue on appeal"].)

In addition, we note the Defendants have cited no authority to support their argument that it was Elizabeth's burden to establish who was an employee under section 12926, subdivision (d).[15] For this separate reason we conclude they have forfeited the issue on appeal. (See rule 8.204(a)(1)(B) [an appellate brief must support each point by argument and, if possible, by citation of authority]; accord, *Tanguilig v. Valdez* (2019) 36 Cal.App.5th 514, 520 ["[w]e may disregard legal arguments that are not supported by citations to legal authority [citation] or are conclusory"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."]; *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by [substantive] argument or citation to authority, we consider the issues [forfeited]."].)

---

[15] Although we find it unnecessary to resolve this issue on appeal, we note the Defendants were the party with superior access to information regarding the relationship status of the various individuals affiliated with the Corporate Defendants. (See *Ott v. Workers' Comp. Appeals Bd.* (1981) 118 Cal.App.3d 912, 922 ["Courts have frequently placed the burden of proof on the party having the greater accessibility to evidence on the issue under consideration."].)

Finally, the record shows in December 2020, Braden Traub e-mailed Elizabeth, Benjamin Perlstein, Marla Palumbo, and Palumbo, requesting that Elizabeth and Marla "add" themselves "as *employees* of CannAssist" on a well-known social media platform. (Italics added.) The e-mail noted that Benjamin Perlstein and Palumbo were "already on there." Traub identified himself as the Director of Marketing and Customer Development, and his e-mail included the "Xceptor Labs" logo. These same five individuals were also included on a promotional sheet used by the Defendants to introduce "Our Team" to potential customers and investors. On that sheet, Traub was described as being in charge of "Information Technology and Customer Development"; Perlstein as "V.P. Operations"; Elizabeth as "Managing Director Sales and Marketing"; Palumbo as "CEO"; and Marla Palumbo as "President."[16]

Thus, even without forfeiture, we conclude substantial evidence supports the finding that the Corporate Defendants, and CannAssist in particular, had five employees for purposes of section 12926, subdivision (d). (See *Caldera, supra*, 25 Cal.App.5th at p. 37 [we review the entire record to determine whether " 'there is substantial evidence, contradicted or uncontradicted, which will support the determination' "]; accord, *Thompson, supra*, 6 Cal.App.5th at p. 981.)

---

[16]    Perlstein's name appeared to have been misspelled as "Perstein."

For all these reasons, we deny the Corporate Defendants' claim that the trial court erred in imposing liability under subdivision (k) of section 12940 for their failure to prevent harassment.[17]

## DISPOSITION

We affirm the judgment. Elizabeth is entitled to her costs on appeal. (Rule 8.278(a)(1) & (2).)

O'ROURKE, Acting P. J.

WE CONCUR:

KELETY, J.

RUBIN, J.

---

[17] The Defendants also sought reversal of the attorney fees awarded Elizabeth, based on their claim of insufficiency of the evidence or their request we adopt a "new requirement requiring proof of a documented complaint" to state a pervasive hostile work environment claim. Because we are affirming the judgment and the Defendants did not challenge the amount of this award, we deem it unnecessary to address the issue of fees in this opinion.